NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0067n.06

No. 24-3924

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 02, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| TAUREEN NICKLES, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: CLAY, KETHLEDGE, and BUSH, Circuit Judges.

KETHLEDGE, Circuit Judge. Taureen Nickles appeals the revocation of his supervised release. We reject his arguments and affirm.

I.

One night in October 2014, Nickles and several coconspirators robbed three Cincinnati businesses at gunpoint. A grand jury later indicted the group on a variety of charges, and in 2016 Nickles pled guilty to two counts of Hobbs Act robbery. The district court sentenced him to 66 months in prison, followed by three years of supervised release.

In April 2020, Nickles began his term of supervision. In 2021, the district court revoked Nickles's supervised release after he admitted to two violations of its conditions, which included beating a woman unconscious and stealing her property. For those violations, the court sentenced him to one day in prison (for which he was given credit for time served), followed by two years of supervised release. In 2023, the district court again revoked Nickles's supervised release after he admitted to two violations—including stealing three TVs from a hotel where he previously

worked—and was found guilty of a third—for "slamm[ing] his girlfriend on a table" and "str[iking] her in the arm with a cord." For those violations, the court again sentenced him to one day in prison, with credit for time served, followed by three years of supervised release.

About a year later, Nickles went to his mother-in-law's house in Cincinnati, where his wife, Latisse Cousins, was staying after having given birth by emergency caesarean section. What happened at the house is contested. Shortly thereafter, however, prosecutors in Hamilton County charged Nickles with domestic violence against Cousins and with assault against his mother-in-law, Charlene Robinson. The charges were ultimately dismissed for want of prosecution, apparently because Robinson failed to appear to testify at trial. Nickles was soon also charged in federal court with two violations of his supervised release: one for committing a state crime during the incident at Robinson's house, and the other for failing to participate in a substance-abuse treatment program as directed by his probation officer.

The district court later held a hearing on those alleged violations. Nickles and Robinson each testified about the incident at Robinson's house. According to Nickles, he was arguing with Cousins outside the house when Robinson suddenly "hit" him from his "blind side." Several of his wife's relatives then joined in to beat him, he said, including a "big guy" who "came down" on his head with a "bat"; so Nickles fled and went to the hospital. By contrast, according to Robinson, she and Cousins were sitting on the front porch when they saw Nickles "speeding" up the street; both women then fled inside the house, but he forced his way inside by kicking the door open. Then, Robinson said, Nickles "grabbed" Cousins "by the hair," "head-butted" her, and "banged her head" against the door. When Robinson tried to intervene, Nickles punched her "at least three times," and left the house only after Robinson's husband "cracked" him in the head

with a "stick." Meanwhile, Robinson's grandson called 911, and Cincinnati police came to the house to investigate.

The district court found that Nickles had committed both alleged violations. The court said Robinson's testimony—which the court found "extremely compelling and truthful"—showed that Nickles had broken into her house and "assaulted both her and her daughter" (who had "just gotten out of the hospital after an emergency C-section and had staples in her stomach"). That made it "clear," the court found, that Nickles had committed "domestic violence and assault." The court also found that Nickles had violated the substance-abuse treatment condition, citing his probation officer's testimony that Nickles had attended "50 percent" of the sessions to which the officer had referred him.

The district court sentenced Nickles to 24 months in prison—the maximum sentence available—stating that, though the court had earlier given Nickles "a break" on similar supervised-release violations, it would now "put him away for as long as possible," since he posed "an extreme danger" to his wife, mother-in-law, and children. This appeal followed.

II.

We review the district court's legal conclusions de novo, its factual findings for clear error, and its decision to revoke a defendant's supervised release for an abuse of discretion. *United States v. Kontrol*, 554 F.3d 1089, 1091–92 (6th Cir. 2009). Under clear-error review, we must uphold the district court's findings if they are "plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). A factual finding based on a judge's decision to credit a witness's "coherent," "facially plausible" testimony not "contradicted by extrinsic evidence" can "virtually never be clear error." *Id.* at 575.

A.

Nickles argues that the district court clearly erred by crediting Robinson's account of the June 3 incident.

To that end, he first contends that the court accepted Robinson's account despite, he says, a lack of "objective corroboration." But Robinson's testimony was corroborated by her grandson's 911 call—describing how Nickles had "busted inside" the house by "kicking" the door and then "assaulted" both Cousins and Robinson—and by Cousins's written statement to the police that Nickles had "busted in the door," "head butted" her, and "hit" Robinson. Nickles responds that the investigating police officer later testified that he saw only some of Cousins's alleged injuries, and no injuries to Robinson, nor any damage to the front door that had clearly "happened that night." Although those omissions arguably contradict Robinson's testimony as to how Nickles assaulted Robinson and Cousins, neither omission necessarily contradicts Robinson's testimony as to whether Nickles had in fact assaulted Robinson and Cousins that night.

Nickles also asserts that Robinson gave an implausible explanation for her failure to testify at Nickles's state-court trial—that she "got too sick to arrive on time"—which, he says, discredits all her testimony. Suffice it to say, however, Robinson gave an explanation of her absence—that she had gotten sick after being near people who were "coughing" while waiting to testify in state court the day before. The district court was free to believe that testimony and to reject Nickles's speculation on that point. *See United States v. Crousore*, 1 F.3d 382, 386 (6th Cir. 1993).

Nickles last contends that the district court should have rejected Robinson's testimony because Robinson herself testified that she considered his relationship with Cousins to be a "thorn" in her family's side, among other such criticisms of him. But that putative "admitted bias" (Nickles's term) does not "automatically" render Robinson's testimony "unreliable." *United*

*States v. Smith*, 140 F.4th 316, 320–21 (6th Cir. 2025). So we reject that contention also. The district court was free to accept Robinson's testimony. *See Anderson*, 470 U.S. at 574–75.

B.

Nickles also argues that, in revoking his supervised release, the district court denied him due process. True, when revoking a defendant's supervised release, a district court must provide a written statement of "the evidence relied upon and the reasons for revoking" supervision. *United States v. Gilbert*, 990 F.2d 916, 917 (6th Cir. 1993). And a transcript of the revocation hearing satisfies that requirement. *Id.*

Here, the district court explained that it found Robinson's testimony compelling and thus that Nickles had committed "domestic violence and assault." That was explanation enough to afford Nickles due process. *Gilbert*, 990 F.2d at 917, n.1. True, the court could have explained further why it found Robinson reliable; but given the record as a whole (including the corroborating evidence), the court's explanation satisfied due process.

Finally, Nickles likewise argues that the district court should have explained better why it found that he had failed to participate in a substance-abuse program as directed by his probation officer. But on that point the court cited the officer's testimony that Nickles had attended only half of the required treatment sessions. That explanation likewise satisfied due process. *Gilbert*, 990 F.2d at 917, n.1.

The district court's judgment is affirmed.